DSS:SDD/DCP
F. #2013R01562

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

AMIR ZAKARIA DANIAL DAWOD
ASTAFANOS,
MALAK NESEEM SWARES BOULOS and
AMGED KAMEL YONAN TAWDRAUS,

             Defendants.

– – – – – – – – – – – – – – – X

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
ARREST WARRANT

(T. 18 U.S.C. §§ 371 and 3551
et seq.; T. 22, U.S.C., §§
2778(b)(2) and (c); T. 22,
C.F.R., §§ 120 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

        JOSEPH HONG, being duly sworn, deposes and states that he is a Special Agent

with the United States Department of Homeland Security, Homeland Security Investigations, duly

appointed according to law and acting as such.

        1.      On or about and between February 1, 2011 and September 20, 2013,

within the Eastern District of New York and elsewhere, the defendants AMIR ZAKARIA

DANIAL DAWOD ASTAFANOS ("ZAKARIA"), MALAK NESEEM SWARES BOULOS

("NESEEM") and AMGED KAMEL YONAN TAWDRAUS ("KAMEL"), together with

others, did knowingly and willfully conspire to export from the United States to Egypt defense

articles, designated on the United States Munitions List ("USML"), to wit: M-42 bomblet

bodies, trumpet liners and a land mine, without first obtaining the required license or written

approval from the State Department, contrary to Title 22, United States Code, Sections

2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations, Parts 121 and 127.

2.     In furtherance of the conspiracy and to effect its unlawful objectives, within the Eastern District of New York and elsewhere, the defendants ZAKARIA, NESEEM, and KAMEL, together with others, committed and caused the commission of, among others, the following:

<u>OVERT ACTS</u>

a.     On or about February 17, 2011, ZAKARIA requested a quotation for the price and availability of 1,000,000 bomblet bodies and 1,000,000 trumpet liners from a law enforcement agent acting in an undercover capacity ("UC-1").

b.     On or about February 23, 2011, ZAKARIA engaged in a conversation over "SKYPE," an internet application that allows users to engage in live video conversations through their computers, with UC-1 in which he acknowledged that the bomblet bodies required an export license pursuant to U.S. law.

c.     On or about April 5, 2011, ZAKARIA engaged in a conversation over SKYPE with UC-1 in which he stated that he wanted to obtain M-42 bomblets.

d.     On or about May 18, 2011, ZAKARIA sent an email to UC-1 stating that UC-1 should avoid U.S. export license requirements by intentionally mislabeling a package containing the bomblet bodies and trumpet liners.

e.     On or about May 28, 2011, ZAKARIA sent an email to UC-1 in which he proposed methods to export the bomblet bodies and trumpet liners without a U.S. export license.

f.     On or about June 26, 2011, ZAKARIA, NESEEM and KAMEL met with UC-1 and stated that, due to inspection at the airport, the defendants should discuss

alternate methods for shipping the bomblet bodies, trumpet liners and land mine to Egypt without an export license.

g.      On or about June 28, 2011, ZAKARIA and NESEEM stated in a meeting with UC-1 that they intended to mislabel a package containing bomblet bodies to evade export requirements.

h.      On or about June 29, 2011, ZAKARIA, NESEEM and KAMEL stated in a meeting with UC-1 that they intended to ship 10 bomblet bodies and trumpet liners from the United States to Egypt without obtaining an export license.

i.      On or about July 1, 2011, ZAKARIA, NESEEM and KAMEL packaged the bomblet bodies, trumpet liners and land mine for international shipping.

j.      On or about July 1, 2011, ZAKARIA, NESEEM and KAMEL intentionally mislabeled the commercial invoices for the content of that package to avoid export regulations.

k.      On or about September 20, 2013, ZAKARIA engaged in a SKYPE conversation with UC-1 in which he discussed his prior efforts to ship bomblet bodies and a land mine from the United States to Egypt.

(T. 18 United States Code, Section 371 and 3551 et seq.; T. 22, U.S.C., §§ 2778(b)(2) and (c); T. 22, C.F.R., §§ 121 and 127)

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

3.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have served in this capacity since 2009.   I am currently assigned to the Counter Proliferation Investigations Group at HSI.   My duties include the investigation and enforcement of federal laws involving the unlicensed export of controlled commodities, including certain types of munitions, submunitions and bomblets.

4.      As an HSI special agent, I have received advanced training at the Federal Law Enforcement Training Center ("FLETC").   In addition, I have conducted and participated in several investigations involving the unlicensed export of U.S. commodities, including munitions, submunitions and bomblets.

5.      Through my training, education, and experience—which has included (i) reviewing financial records; (ii) conducting surveillance of individuals engaged in the violation of federal law; and (iii) executing search warrants on suspect premises—I have become familiar with the manner in which controlled commodities are unlawfully exported from the United States to foreign countries, directly or indirectly, to avoid both licensing requirements and detection by law enforcement.

6.      I have personally participated in this investigation and have witnessed some of the facts and circumstances described herein.   In addition, I have received information from other federal law enforcement officials.   I also have reviewed documents obtained during the course of the investigation.   The statements contained in this affidavit are based on my own observations as well as the review of documents and reliable information provided to me by other law enforcement personnel.   Where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in

part, except where otherwise indicated.   In addition, where foreign language materials or conversations are referenced, they are based on summary draft translations, which are subject to revision.

I.      INTRODUCTION

7.      Since in or about February 2011, I have been participating in the investigation of the defendants ZAKARIA, NESEEM, KAMEL and others for possible violations of U.S. export laws, including the unlicensed export of defense articles, including munitions and submunitions, which are regulated by the United States government.   This investigation has revealed that the defendants ZAKARIA, NESEEM, and KAMEL conspired to unlawfully export munitions and submunitions, to wit, bomblet bodies, trumpet liners and a land mine from the United States to Egypt without first obtaining the necessary export licenses, in violation of 22 U.S.C. § 2778(c).

8.      At all times relevant to the complaint, pursuant to Title 22, United States Code, Section 2778(b)(2), defense articles designated by the President of the United States on the USML may not be exported without a license from the United States Department of State, Directorate of Defense Trade Controls ("DDTC").   In addition, pursuant to Title 22, Code of Federal Regulations, Section 120, et seq., the DDTC is responsible for the administration of the International Traffic in Arms Regulations ("ITAR") as they relate to the manufacture, brokering, import, export, and transfer of defense articles and defense services.   Title 22, United States Code, Section 2778(c) provides criminal penalties for willful violations of Section 2778.

9.      Category IV of the USML pertains to "Launch Vehicles, Guided Missiles, Rockets, Torpedoes, Bombs and Mines."   With respect to the land mine, Category

IV(a) expressly applies to, inter alia, "land and naval mines."   With respect to the bomblet bodies and trumpet liners, Category IV(h) applies to "All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category."[2]   Section 123.1 of the Code of Federal Regulations provides that "Any person who intends to export . . . a defense article must obtain the approval of the [DDTC] prior to the export or temporary import, unless the export or temporary import qualifies for an exemption under the provisions of this subchapter."   22 C.F.R. § 123.1(a).

II.    FACTUAL ALLEGATIONS

10.    AMA United Group is a corporation based in Cairo, Egypt.   According to its marketing materials, AMA United Group "supplies precision tools, machine tools and various specialty materials to the metal working industry as well as to sophisticated automotive and aerospace industry."   ZAKARIA has stated that AMA United Group was founded in 1998.

11.    ZAKARIA is an Egyptian national.   According to information provided in connection with a previous U.S. visa application, ZAKARIA is the Partner and Technical Director of AMA United Group.

12.    KAMEL is an Egyptian national.   According to information provided in connection with a previous U.S. visa application, KAMEL was a Partner and Sales and Marketing Director of AMA United Group.

---

[2] While the M-42 can be delivered by various means, such as artillery under USML Category III or rockets under Category IV, it is considered to be a self-contained bomblet or grenade.   Therefore the M-42 bomblet body, as a component of the M-42 bomblet submunition, is more accurately covered under USML Category IV(h).

13.     NESEEM is an Egyptian national.   According to information provided in connection with a previous U.S. visa application, NESEEM was a Partner and Foreign Procurement Director of AMA United Group.

14.     UC-1 is a law enforcement agent operating in an undercover capacity. During the relevant time frame, UC-1 was operating under the auspices that he was an employee of a private company engaged in, inter alia, defense contracting and procurement.

15.     UC-2 is an Arabic-speaking law enforcement agent operating in an undercover capacity.   During the relevant time frame, UC-2 was operating under the auspices that he was also an employee of the same private company as UC-1 and was serving as an Arabic translator for UC-1.

A.   Initial Contact with the Defendants

16.     This investigation is being coordinated by HSI and the Defense Criminal Investigative Service ("DCIS").   To date, the investigation has revealed that the defendants and others have been involved in acquiring M-42 bomblet bodies, trumpet liners and land mines for export to Egypt in contravention of U.S. export control laws and allegations.

17.     On or about February 17, 2011, defendant ZAKARIA contacted UC-1 via email on behalf of a company he identified as AMA United Group, with a request for quote ("RFQ") for 1,000,000 bomblet bodies with rivets and 1,000,000 trumpet liners.

18.     A "bomblet" is a type of submunition defined as "one of a number of small bombs usually contained in a cluster bomb and released in mid-air."   The United States Army has identified the M-42 bomblet as a particular type of bomblet used in a 155 mm or equivalent rocket.   Typically, bomblets are stacked in rows, one on top of another, within the rocket warhead. When the rocket is in flight, the warhead breaks apart from its other

components and the bomblets are released and distributed into the airstream to cover a large surface area and detonate independently.   A "bomblet body" is the metal casing or shell used in the production of bomblets, which, standing alone, does not contain the explosive materials or fuse used to detonate the bomblets.   To my knowledge, a "bomblet body" has no legitimate or approved use other than for the production of bomblets.

19.   A "trumpet liner" is a conical, shaped object that fits inside the bomblet and is used to focus the direction of a blast wave and increase penetrability, specifically, to increase the bomblet's armor-piercing capabilities.

20.   On or about February 23, 2011, UC-1 and ZAKARIA communicated via SKYPE and discussed the following, among other things in substance and in part:

a.   ZAKARIA stated that AMA United Group procured military components.

b.   ZAKARIA stressed that the order of 1,000,000 bomblet bodies and 1,000,000 trumpet liners was very important.

c.   UC-1 informed ZAKARIA that "my country requires me to get an export license to send the items to you in Egypt, because they're considered military items." When UC-1 asked ZAKARIA to confirm that he understood the requirement, ZAKARIA responded "Yeah."

21.   On or about April 5, 2011, UC-1 and ZAKARIA communicated via SKYPE and discussed, among other things and in substance and in part, that the contract for the bomblets and trumpet liners was an urgent matter for AMA United Group's client, and that ZAKARIA was specifically looking to obtain M-42 bomblets.

22.     On or about May 18, 2011, ZAKARIA sent UC-1 an e-mail requesting the bomblet samples be sent to Egypt within 10 days.   The same day, UC-1 sent an email to ZAKARIA stating "I can not send the samples to you. They are much too sensitive to send by courier. Plus, a license is needed to export them."   Later on May 18, 2011, UC-1 received an email response from ZAKARIA in which ZAKARIA stated that UC-1 should "send the samples by courier and don't refer to it as a military parts but a normal samples, so you can't need in this case to the license export."

23.     On or about May 27, 2011, UC-1 sent ZAKARIA an e-mail stating that "we can not send the sample to you in Egypt for the same reasons we discussed before."

24.     On or about May 28, 2011, ZAKARIA sent UC-1 an email containing alternate options to have the samples sent to Egypt.   The e-mail stated:

> 1 – My close Friend is a Pilot in the Egypt Air , he always travel to USA every week , He can meet you and collect the samples from your side and he can deliver it to us ASAP without any troubles or problem in the inspection.
>
> 2 – Member of our stuff is already have the American Visa , he can travel to USA and collect the samples from your side .
>
> 3 – Our Egyptian representative in USA , can meet you to take the samples and he can ship it by TNT or DHL to our address in Egypt without any Export Licence.

25.     On or about June 2, 2011, UC-1 and ZAKARIA communicated via SKYPE.   During that conversation, ZAKARIA stated that he had given the pilot with Egyptian Air (the "Pilot") contact information for UC-1.   ZAKARIA confirmed that the Pilot had contacted UC-1 from Egypt.   UC-1 asked ZAKARIA "can I give some of the, the pilot some of the land mines too?   The small ones?"   ZAKARIA responded, "Ah, no problem.   Okay, no problem."

26.     On or about June 14, 2011, UC-1 placed a telephone call to ZAKARIA. On that call, ZAKARIA informed the UC-1 that the Pilot's friend would pick up the samples from UC-1 and fly with them to Egypt.

27.     On or about June 26, 2011, defendants ZAKARIA, NESEEM, and KAMEL traveled to John F. Kennedy International Airport ("J.F.K. Airport") in Queens, New York from Cairo, Egypt in order to conduct a series of meetings with UC-1 and obtain samples of the bomblet bodies and trumpet liners, along with a land mine, to bring back to Egypt, as well as to discuss arrangements regarding the anticipated purchase of approximately 2 million bomblet bodies with trumpet liners.

B.  The Defendants' Activities in the United States

28.     On or about June 26, 2011, UC-1 and the defendants drove from J.F.K. Airport to a residence in Jersey City, New Jersey where the defendants would stay while they were in the U.S. (the "Jersey City Residence").   During the ride from J.F.K. Airport, the following was discussed:

a.     ZAKARIA told UC-1 that in coming into the United States, Customs and Border Protection had thoroughly inspected the luggage of at least one of the defendants.

b.     In light of the baggage examination they experienced entering the U.S., the defendants no longer were comfortable transporting the samples of the bomblet bodies, trumpet liners, and land mine out of the United States in their carry-on luggage. ZAKARIA observed to UC-1 that "how we can get the samples and go through the airport and all the inspection, this is a problem.   . . . [b]ecause we already inspected a lot in Washington and it will be impossible to pass the samples."

   c. Instead, ZAKARIA requested that they discuss alternative methods of shipping the bomblet bodies, trumpet liners, and land mine back to their third-party customer in Egypt to avoid inspection at the airport.

   29. On or about June 28, 2011, a meeting between UC-1, UC-2, ZAKARIA, NESEEM, and KAMEL, as well as others, was held in Manhattan, New York at which time UC-1, ZAKARIA, NESEEM, and KAMEL discussed the following:

   a. ZAKARIA, NESEEM, and KAMEL identified themselves as representatives of AMA United Group.

   b. ZAKARIA stated AMA United Group dealt with "top secret" military projects and has dealt with many U.S. companies including companies located in New York and California.

   c. ZAKARIA, NESEEM, and KAMEL discussed with UC-1 specific contractual terms and acknowledged that U.S. export control laws applied to the agreement.

   d. ZAKARIA acknowledged AMA United Group could not receive a shipment of bomblet bodies and trumpet liners because it was a civilian company, insisting that the shipment must go directly to a military facility.

   e. ZAKARIA, NESEEM, and KAMEL discussed with UC-1 how to ship potential samples to Egypt and the need for an export license:

    ZAKARIA: Is it the whole quantity or the samples? License for the samples or for the whole quantity, two million?

    UC-1: Anything.

    ZAKARIA: Anything.

| UC-1: | Anything, yeah. |
|---|---|
| NESEEM: | Even if it is one? |
| UC-1: | Even if is one, because it is a real, it is real. |
| UC-2: | Even if it is one. |
| ZAKARIA: | It is sample.   We can, we can say these are samples of spare parts. |
| NESEEM: | We will not say this is a bomblet. |
| ZAKARIA: | We will not say this is a bomblet. |

f.      ZAKARIA stated that once the samples were exported, inspected and approved by AMA United Group's customer in Egypt, the manufacturer would then apply for an export license for the remainder of the shipment (i.e., 2 million units).

g.      ZAKARIA, NESEEM, and KAMEL initially indicated that they wanted to send 10 bomblet bodies and trumpet liners to their customer in Egypt that day, but ultimately they agreed that they would meet again to discuss shipping the components the following day.

h.      During the meeting, UC-1 showed ZAKARIA, NESEEM, and KAMEL the samples of the bomblet bodies and land mine.   ZAKARIA, NESEEM, and KAMEL each examined and handled the bomblet bodies and landmine and discussed the land mine's specific capabilities.

i.      ZAKARIA, NESEEM, and KAMEL indicated that each had a laptop computer, which they had brought to the United States, and that each of them had used the laptop computer to correspond with UC-1 and/or had reviewed correspondence from UC-1 related to the anticipated transaction of two million bomblet bodies with trumpet liners as well

as discussions about how to send the bomblet bodies, trumpet liners, and a land mine to AMA United Group in Egypt without obtaining the necessary export licenses.

30.     On or about June 29, 2011, a meeting between UC-1, UC-2, ZAKARIA, NESEEM, and KAMEL, as well as others, was held in Manhattan, New York at which time UC-1, ZAKARIA, NESEEM, and KAMEL discussed the following:

a.     UC-1 again explained to ZAKARIA, NESEEM, and KAMEL that an export license was required to ship even a minimal number of the bomblet bodies and trumpet liners to Egypt.

b.     ZAKARIA, NESEEM, and KAMEL acknowledged that an export license was required, but nevertheless indicated that they intended to ship the ten bomblet bodies and trumpet liners via commercial carrier without obtaining a license.   However, they further indicated that they (or their ultimate end-user client) would later apply for an export license for the remainder of the shipment:

UC-1:      So you just want to take the—the ten—you want to take the ten from me with the landmine and send it to SAKR?   Is that what you want?    Do you want a license for those?

ZAKARIA:   Without licenses.

UC-1:      Without a license.   You—I'm sorry, what did—it's loud, I told you my—

ZAKARIA:   We will ship the samples by ourselves.   And after that—

UC-1:      Are you gonna get a license for the samples, or no?

ZAKARIA:   No, I will send it as a sample.

UC-1:      What are you gonna put on the paperwork?   I want to make sure this doesn't come back to me.

ZAKARIA:    Sure.

UC-1:       How—what are you gonna do?

ZAKARIA:    I didn't—I didn't refer to your company.

UC-1:       What are you gonna put it as?

UC-2:       He asks… in the... the...

UC-1:       Okay, as long as you don't refer to me, that's fine.
            You won't refer to me?   You give me your word?

ZAKARIA:    Sure, I will not refer to your company name.

UC-1:       Okay.   Okay.

UC-2:       They—they'll take care of the shipping.

UC-1:       Okay.

ZAKARIA:    We will ship it here using our way.

UC-1:       Okay, everyone agrees, each of you?

ZAKARIA:    Yes.

        c.       UC-1 told ZAKARIA, NESEEM, and KAMEL that it would be better to ship the samples on Friday, July 1, 2011, because there would be fewer inspections due to the holiday.

        31.       On or about July 1, 2011, UC-1 picked up ZAKARIA, NESEEM, and KAMEL at the Jersey City Residence and drove them to the vicinity of Rockefeller Center in Manhattan.

        a.       When UC-1's vehicle arrived in the vicinity of 50th Street and Rockefeller Plaza, UC-1 pulled his vehicle to the side of the road and opened the trunk.   While

standing at the open trunk, ZAKARIA, NESEEM, and KAMEL packaged the bomblet bodies, trumpet liners and land mine for international shipping.

b.      While standing at UC-1's vehicle on 50th Street, the defendants ZAKARIA, NESEEM, and KAMEL discussed how to complete the shipping documents and commercial invoice.   With NESEEM and KAMEL standing next to him, ZAKARIA filled out a commercial invoice for the package containing the bomblet bodies and trumpet liners and falsely described the contents of the package as "metal samples" and "copper samples," respectively, with a total value of $5.   The commercial invoice ZAKARIA completed also falsely described the land mine as a "meter sample," with a value of $1.

c.      The recipient on both packaging labels was "SAKR Factory," a munitions factory in Egypt, and the labels included an address in Egypt as the destination address.

d.      UC-1, ZAKARIA, NESEEM, and KAMEL then walked approximately one block south to the vicinity of 49th Street and 5th Avenue where a vehicle from a private shipping company arrived to pick up the items that ZAKARIA, NESEEM, and KAMEL had packaged.

e.      ZAKARIA, NESEEM, and KAMEL provided the package to the representative of the private shipping company so that it could be shipped internationally.

32.     On or about July 1, 2011, Customs and Border Protection Officers seized the packages the defendants had attempted to ship through the private shipping company at J.F.K. Airport in Queens, NY.

33.     On or about July 5, 2011, UC-1 had a monitored telephone conversation with ZAKARIA and the following discussion took place:

UC-1:      I think U.S. Customs seized [the package] because there's a bomblet and a landmine in the box and that can't be exported without the license.   That's why U.S. Customs seized it.   So, now we're in trouble.   I told you not to put my name on the airway bill and you put my company's name on the airway bill.   Now you have to fix this.

ZAKARIA:   Yeah.   Um, I don't know what I can do, but, let me get you [UI].   I go now.

UC-1:      I would call your people in Egypt and see if they have any ideas.

ZAKARIA:   Today, am now in Egypt, it is six o'clock, so they, they are already finished their work.   And, they, they, they don't have idea about this customs.   I, ah, what they [UI] is today the customs cleared it in Egypt and we will pay the customs costs.

UC-1:      Well, it's not as simple as that.   I think we're in a lot of trouble because it was illegal for us to put this in, in the box and send it off without a license and I, I, it wasn't my idea to do this or to use [the private shipping company].   This is your, your fault, you have to fix this.

ZAKARIA:   Yeah.

34.     On or about July 5, 2011, UC-2 and ZAKARIA had a telephone call that was intercepted pursuant to a judicially authorized wiretap.

        a.     UC-2 told ZAKARIA that UC-2 understood from UC-1 that the shipment was confiscated by the U.S. government, and that the UC-1 was concerned because it had been shipped without meeting the proper requirements.

        b.     ZAKARIA responded that he was confused as to why UC-1 is concerned because ZAKARIA had written his own name and his company's name and address in Egypt on the package.

   c.  ZAKARIA claimed that he did not understand why he would be paying anything to customs here in the United States.

   d.  ZAKARIA further stated that he wanted to obtain an export license because UC-1 told ZAKARIA that it will cost only one thousand dollars.

   e.  ZAKARIA asked UC-2 to call UC-1 and find out if there is a way to get the merchandise to Egypt because ZAKARIA wanted to fix the problem before returning to Egypt later that day.

   35.  On or about July 6, 2011, law enforcement agents executed a search warrant at the Jersey City Residence. During the execution of the search warrant, law enforcement agents conducted consensual interviews with ZAKARIA, KAMEL, and NESEEM.

   a.  ZAKARIA stated, in sum and substance, that he knew the shipment of samples contained the bomblet bodies and land mine, but they had intentionally mislabeled the bomblet bodies as metal samples, the trumpet liner as a copper sample, and the land mine as a meter sample. ZAKARIA initially denied knowledge of the export license requirement but later admitted that UC-1 had informed them that an export license was required but claimed UC-1 had advised them to export the samples without one. ZAKARIA further stated that he understood the U.S. law requiring an export license for the samples, but claimed he did not pursue one because he did not understand the seriousness of the law. ZAKARIA also stated that he, KAMEL and NESEEM knew they were exporting samples that were munitions controlled by U.S. law and required an export license for shipment to Egypt. ZAKARIA stated that he, KAMEL and NESEEM agreed to illegally export the samples to Egypt without an export license.

b.      KAMEL stated, in sum and substance, that he had heard, on several occasions, that U.S. law requires an export license in order to export samples to Egypt, prior to the defendant's attempted export of the samples, but claimed that he did not fully understand the seriousness of the requirement.

c.      NESEEM stated, in sum and substance, that UC-1 had advised them of the export license requirement to ship the bomblets and land mine out of the U.S., but claimed that he did not know they needed an export license for the samples.

36.      On or about July 6, 2011, ZAKARIA, KAMEL, and NESEEM departed the United States from J.F.K. Airport on a flight to Egypt.

C.   Post-Departure Attempts to Procure Items

37.      On or about December 6, 2011, UC-1 received an email from the AMA United Group's e-mail address that was signed "Amir Zakaria."   On that email, the sender stated that he had spoken with a senior member of the Egyptian customs authority who had informed him that, since the metal bodies do not contain explosives, the samples are not considered "Military parts" and "doesn't require any Export License."   The sender also stated that this position is supported by the fact that other U.S. companies had shipped similar samples.

38.      On or about December 6, 2011, UC-1 responded to the AMA United Group's e-mail address and stated, among other things, the following:

> Now, the Egyptian customs can't tell the American authorities, i.e., American customs what may or may not require an export license (issued by the U.S. that is.)   However, what you have explained to me is very positive.   Just so you know, and I believe that you'll recall this from our meeting, there were no explosvies [sic] in the bomblet body with rivets and trumpet line or in the land mine sample.

39.     On or about December 7, 2011, ZAKARIA contacted UC-1 and stated, in sum and substance, that representatives of the SAKR Factory had received samples of 12 bomblet bodies in Egypt from one company located in the United States and had received additional samples from another U.S. company.   ZAKARIA provided UC-1 with the names of the employees he worked with at the U.S. company that provided the samples.   ZAKARIA stated that he did not believe that the other companies had secured export licenses for those samples.   ZAKARA stated that the samples the SAKR Factory had received were not acceptable and again asked UC-1 to send samples to Egypt through the U.S. company that had just sent samples to the SAKR Factory.

40.     On or about December 9, 2011, ZAKARIA stated, in sum and substance, that the bomblet bodies sent by the other U.S. companies had been sent without export licenses in packages that were mislabeled as containing steel parts.

a.     ZAKARIA again asked UC-1 to send the bomblet bodies to Egypt.   UC-1 advised ZAKARIA that he had "issues with authorities here in the United States. That's what prohibits me from sending you the bomblets, the bomblet samples."   ZAKARIA responded, "Yes, I understand."

b.     ZAKARIA proceeded to tell UC-1 that he would arrange the shipping and "be responsible for the shipment."

41.     On or about September 20, 2013, UC-1 and ZAKARIA communicated via SKYPE.   During that conversation, ZAKARIA and UC-1 discussed their previous attempt to ship bomblet bodies and a land mine from Egypt to the U.S.

D.  <u>DDTC Certified License Determinations</u>

42.     On April 4, 2013, I received a Pre-Trial Certification Letter from the DDTC indicating that M-42 submunition/bomblet bodies, with or without rivets, are defined by ITAR as defense articles of the nature described in Category IV(h) of the USML.   While a Pre-Trial Certification Letter is still pending with respect to the trumpet liners, an initial license determination was obtained from DDTC stating that the trumpet liners also fall within Category IV(h) of the USML, as set forth above.   Moreover, a Pre-Trial Certification Letter is still pending with respect to the land mine, however, an initial license determination was obtained from DDTC stating that the land mine falls within Category IV(a) of the USML, as set forth above.

E.  <u>Export License Checks</u>

43.     I have been advised that, based on a search of DDTC records, neither the defendants ZAKARIA, NESEEM, or KAMEL, nor any of the other individuals involved in the export scheme with the defendants, possessed a license from the State Department to export bomblet bodies, trumpet liners or land mines from the United States.

III.   REQUEST TO SEAL

    44.   Because public filing of this document could result in a risk of flight by the defendants as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint be filed under seal.

*      *      *

    WHEREFORE, your deponent respectfully requests that the defendants AMIR ZAKARIA DANIAL DAWOD ASTAFANOS, MALAK NESEEM SWARES BOULOS and AMGED KAMEL YONAN TAWDRAUS, be dealt with according to law.

_____
JOSEPH HONG
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
30th day of September, 2013

*s/ Cheryl L. Pollak*

_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK